1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT
8             FOR THE DISTRICT OF ARIZONA
9
10   United States of America,          )   CR 10-1245-TUC-JMR(HCE)
                                         )
11          Plaintiff,                   )   **REPORT AND RECOMMENDATION**
                                         )
12   vs.                                 )
                                         )
13                                       )
     Julio Rivera-Baltazar; Santos Alvarez, Jr.;)
14   Guadalupe Fermin Ramirez,           )
                                         )
15          Defendants.                  )
                                         )
16   _____ )
17
18          Defendant Santos Alvarez, Jr. (hereinafter "Defendant Alvarez") filed a Motion To
19   Sever Defendant (Doc. 24). Such motion is joined by Defendant Guadalupe Fermin Ramirez
     (hereinafter "Defendant Ramirez) (Doc. 25). The Court deems joinder by Defendant Julio
20   Rivera-Baltazar (hereinafter "Defendant Rivera-Baltazar"). The Government filed a
21   Response To Defense Motion To Sever (Doc. no. 28). The Government has also filed a
22   Supplemental Briefing (Doc. 66) to its Response To Defense Motion To Sever. This motion
23   came on for hearing on August 23, 2010. Border Patrol Agent James Grayson (hereinafter
24   "BPA Grayson) and Border Patrol Agent David Narrance (hereinafter "BPA Narrance")
25   testified (hereinafter "Grayson at p. _" and "Narrance at p. _") for the Government.
26          Transcript of the August 23, 2010 evidentiary hearing was ordered by the
27   Magistrate Judge, filed on August 31, 2010 (Doc. 63), and is forwarded to the District Court
28

for review.

Six exhibits were admitted into evidence: (1) Defense Exhibit 10: burlap strap; (2) Defense Exhibit 11: burlap cord; (3) Defense Exhibit 12: report by Border Patrol Agent James Grayson dated June 28, 2010; (4) Defense Exhibit 13: report by Border Patrol Agent James Grayson dated May 3, 2010; (5) Defense Exhibit 14: report by Border Patrol Agent Davis Narrance dated June 28, 2010 (2 pages); and (6) Defense Exhibit 15: report by Border Patrol Agent David Narrance dated June 28, 2010 (1 page). During the evidentiary hearing, four exhibits were referenced but not admitted into evidence: (1) Government Exhibit 1: photo of Defendant Julio Rivera-Baltazar; (2) Government Exhibit 2: photo of Defendant Santos Alvarez, Jr.: (3) Government Exhibit 3: photo of Defendant Guadalupe Fermin Ramirez; and (4) Government Exhibit 4: Border Patrol *Miranda* advisement card.

The Government has filed a Motion For Admission Of Evidence Under Rule 404(b) (Doc. 65). Defendant Julio Rivera-Baltazar has filed an Opposition [sic] To Government's Motion To Admit 404(b) Evidence (Doc. 71). The Court deems joinder by Defendants Alvarez and Ramirez in Defendant Rivera-Baltazar's Opposition [sic] To Government's Motion To Admit 404(b) Evidence, for consideration in Defendant Alvarez' Motion To Sever Defendant.

After consideration of testimony presented, exhibits admitted into evidence and argument of respective counsel, the Magistrate Judge recommends that: the District Court grant Defendants' Motion To Sever or deny such motion and preclude introduction of statements made by Defendants in the Government's case-in-chief; or the District Court grant Defendants' Motion To Sever as to Defendant Rivera-Baltazar only and grant the Government's Motion For Admission Of Evidence Under Rule 404(b) (Doc. 65) against Defendant Rivera-Baltazar in a severed trial, with Defendants Alvarez and Ramirez to proceed to trial jointly with preclusion of statements made by Defendants in the Government's case-in-chief in such joint trial.

## I. PROCEDURAL AND FACTUAL BACKGROUND

A.    **Charge**

Defendants are charged with: knowingly and intentionally conspiring from a time unknown to May 3, 2010, at or near Three Points in the District of Arizona, to possess with the intent to distribute 120 kilograms of marijuana, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(B)(vii), and 846, Count 1; and knowingly and intentionally possessing on or about May 3, 2010, at or near Three Points in the district of Arizona, 120 kilograms of marijuana, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(B)(vii), Count 2.

B.    **Factual Background**

The Government alleges that on May 3, 2010, BPAs Grayson and Narrance, Border Patrol agents for 12 years and 3½ years respectively, were working at the State Highway 86 Border Patrol checkpoint located west of Three Points, Arizona. (Grayson at p. 10; Narrance at pp. 84-85). The terrain near and around the checkpoint is rocky ground, hills, scrub brush and mesquite trees. (Grayson at p. 11). Approximately 1½ to 2 miles east of the checkpoint is located a rifle range. (Grayson at pp. 11-12; Narrance at p. 85). The terrain near the rifle range is similar to that near and around the checkpoint. (Grayson at p. 12). From the checkpoint to the rifle range, one travels east on State Highway 86 to a dirt road on the north side of the highway at milepost 148, turning left to go north onto the dirt road that leads to the rifle range. (Defense Exhibit 12). The area on the east and west side of the dirt road is open desert. (*Id.*).

BPA Grayson overheard radio transmission sometime between noon and 1:00 p.m., that a vehicle had been seen traveling on the dirt road that leads to the rifle range. (Grayson at pp. 12, 14).[1] BPAs Grayson and Edmison decided to go to the area. (*Id.* at pp. 12-13).

---

[1]BPA Grayson states in Defense Exhibit 12: "On May 3rd, 2010, I responded to an area where a possible group of illegal aliens was waiting to be picked up by a vehicle. This information came from an individual named REDHORN, Elijah, who fled from the area and later told me that he was supposed to pick up several people there. REDHORN had driven north on a dirt road approximately 150 to 200 yards, made a U-turn, and pulled over to the side of the road to speak to an unknown individual. When spotted by Border Patrol Agent Bebber, he sped off, and was eventually stopped."

1    They drove in separate vehicles to an area approximately 100 to 150 yards north of State

2    Highway 86 where they believe a vehicle made a u-turn. (*Id.* at pp. 13, 30, 76). BPA Grayson

3    did not see any footprints in the dirt road. (*Id.* at pp. 76-77). BPA Grayson walked east from

4    his vehicle for approximately one minute,. (*Id.* at pp. 13, 30-31). BPA Edmison was 50 to

5    100 yards south of him also walking east. (*Id.* at pp. 13-14).

6          As BPA Grayson walked east, he saw four individuals sitting on a slope under a

7    mesquite tree, approximately 50 yards from the dirt road. (*Id.* at pp. 14, 31). As he walked

8    towards them, they saw him, stood up and then ran east. (*Id.* at pp. 14-15). He instructed

9    them in English and Spanish to stop. (*Id.* at pp. 15, 16). The four individuals ran into a man-

10   made pit. (*Id.* at p. 15). As he ran after them, BPA Grayson noticed several bundles, later

11   determined to contain marijuana, under a nearby tree 25 to 30 feet away from where the four

12   individuals had been sitting. (*Id.* at p. 16). He drew his firearm when he saw the bundles. (*Id.*

13   at p. 33). One of the four individuals continued running through the man-made pit and

14   escaped. (*Id.* at p. 17). BPA Grayson radioed BPA Edmison, who soon joined him at the

15   man-made pit. (*Id.* at pp. 17, 32). BPA Grayson at first saw only two individuals, Defendants

16   Rivera-Baltazar and Ramirez, until BPA Edmison directed him to where Defendant Alvarez'

17   was lying 15 feet away. (*Id.* at pp.18-19, 36). BPA Grayson went into the man-made pit and

18   handcuffed the three Defendants. (*Id.*). BPA Grayson walked the three Defendants back to

19   his and BPA Edmison's vehicle. (*Id.* at p. 19).

20         **1.    Statements En Route To BPA Vehicles**

21         BPA Grayson asked the Defendants questions regarding their citizenship and why had

22   they ran away from him. (*Id.*). To the latter question, either Defendant Alvarez or Defendant

23   Ramirez   responded that "*we* were scared." (*Id.* at pp. 73, 79-80)(emphasis added).

24   Moreover:

25                   I asked the subjects why *they* ran, and *they* said that *they* "didn't
                     want to get in trouble." I asked them why *they* felt that *they*
26                   would get in trouble. Their answers were ambiguous. *They*
                     claimed that *they* didn't want any trouble.
27

28   (Defense Exhibit 12)(emphasis added). BPA Grayson cannot remember any other specific

1  questions asked of Defendants while walking them back to his vehicle. (*Id.* at pp. 38, 71).

2  **2.    Statements At BPA Vehicles**

3  BPA Narrance was radioed regarding possible drug smuggling at the rifle range.

4  (Narrance at p. 85). He drove his BPA truck to BPAs Grayson's and Edmison's location. (*Id.*

5  at pp. 86-87). He saw BPAs Grayson and Edmison escorting the handcuffed Defendants back

6  to the vehicles where thereafter they sat on the ground at the dirt road's edge. (*Id.*). BPA

7  Morehouse then arrived. (*Id.* at p. 87). BPA Narrance instructed BPA Morehouse to advise

8  the Defendants of their *Miranda* rights. (*Id.* p. 88)[2].

9  Once at the BPA vehicles, BPA Grayson believes that BPA Morehouse advised the

10  Defendants of their *Miranda* rights and that BPA Narrance witnessed such. (Grayson at p.

11  38; Defense Exhibit 13). However, BPA Grayson does not remember if he heard BPA

12  Morehouse administer the *Miranda* rights advisement; does not remember if he saw BPA

13  Narrance witness BPA Morehouse administer the *Miranda* rights advisement; and does not

14  remember if BPA Narrance told him he had advised the Defendant s of their *Miranda* rights.

15  (Grayson at p. 54).

16  According to BPA Narrance, all Defendants appeared to understand their *Miranda*

17  rights; none indicated that he did not understand his *Miranda* rights; each said that they

18  understood their *Miranda* rights; each Defendant said they were willing to answer questions;

19  none of the Defendants stated that they did not want to answer questions; none of Defendants

20  asked for an attorney. (Narrance at pp. 90-92, 97). BPA Narrance then proceeded to question

21  Defendants. (*Id.* at p. 92).

22  _____

23  [2]BPA Narrance wrote two reports, both dated June 28, 2010. (Defense Exhibits 14 and 15). He does not know why he wrote two reports. (Narrance at p. 124). BPA Narrance looked
24  at either BPA Grayson's or BPA Edmison's respective reports to prepare his reports. (*Id.*).
25  BPA Grayson's May 3, 2010 report indicates that BPA Morehouse advised the Defendants of their Miranda rights and BPA Narrance witnessed such. (Defense Exhibit 13).
26  Nonetheless, BPA Narrance stated in one of his June 28, 2010 reports that "I read all individuals their Miranda rights, from an issued Miranda rights card in English as requested
27  by the suspects. All suspects understood their Miranda rights as I read to them and were will
28  [sic] to answer my questions." (Defense Exhibit 14).

1   Defendant Rivera-Baltazar did not answer BPA Narrance's questions; did not react

2   to Defendants Alvarez' and Ramirez' answers to questions asked of them; and neither agreed

3   or disagreed with their answers to questions asked of them. (*Id.* at pp. 93-96). Yet, BPA

4   Narrance states in one of his June 28, 2010 reports that:

5           *The three individuals* admitted to carrying the narcotics through
            the desert, *All individuals* said that *they* found the narcotics
6           abandoned in the desert while on a recreational hike. Guadalupe
            Ramirez and Santos Alvarez stated that *they* were going to keep
7           the narcotics for *themselves* and smoke it. *They* initially would
            not admit to being paid to smuggle narcotics around the SR-86
8           U.S. Border Patrol checkpoint. Julio Baltazar, Guadalupe
            Ramirez, and Santos Alvarez said *they were all three* on a hike.
9

10  (Defense Exhibit 15)(emphasis added). BPA Narrance did not take notes on May 3, 2010,

11  of his conversations with the Defendants and relied entirely on memory to write his reports

12  of June 28, 2010.

13  Questioning of Defendants by Narrance lasted approximately 5 minutes. (*Id.* at p. 96).

14  It is BPA Narrance's recollection that each Defendants signed I-214 waiver of *Miranda*

15  rights forms at the Border Patrol station. (*Id.* at pp. 108-109). The Court has been informed

16  that I-214 BPA waiver of Miranda rights forms for each Defendant do not exist. BPA

17  Narrance does not recall if Defendant Alvarez did or did not invoke his right to remain silent.

18  (*Id.* at p. 110). BPA Grayson does not recall Defendant Alvarez making any specific

19  statements. (Grayson at pp. 43, 45). BPA Grayson remembers a conversation but not

20  anything that was specifically said. (*Id.* at p. 43). Furthermore:

21          Q. [Counsel for Alvarez]: And having looked at those
            documents, what do you recall Mr. Alvarez saying?
22          A. I don't know if it was Mr. Alvarez who said it, but I
            remember a denial in regards to any accusations of smuggling.
23          Q. Okay. Anything else that you remember him saying?
            A. Not him specifically. It may - - may or may not have been
24          him, but just what it says in the - - in the report about them
            finding [the marijuana].
25          Q. Okay. And because you don't have in your report a specific
            person making a specific statement, you can't really tell exactly
26          what he said, correct?
            A. Correct.
27          Q. So it could be that he - - he made no admissions?
            A. Oh, it's possible.
28

1   (*Id.* at pp. 45-46).

2          BPA Grayson, without ascribing specific statements to specific Defendants, stated in

3   his report that:

4              *All three* stated that they were willing to answer questions. *They*
               denied that *they* were smuggling the marijuana, however *they*
5              did say that *they* found it in the desert, and were going to bring
               it to Tucson to keep for *themselves*.

6
7   (Defense Exhibit 13)(emphasis added). Moreover, if any one of the Defendants had declined

8   to talk, it would have been noted in the report. (Grayson at p. 54). Such was not noted in the

    report, despite BPA Narrance testifying that Defendant Rivera-Baltazar did not make any
9
    statements. (Narrance at pp. 93-96).
10
           BPA Narrance ascribes to *only* Defendants Alvarez and Ramirez the following:
11
              Q. [Counsel for Alvarez]: Now, did - - Santos Alvarez ever say
12             anything to you in response to any questions?
               A. Yes.
13             Q. What did he say?
               A. In response to which question?
14             Q. Any question. What - - what did he say to you?
               A. In - - in response to - - well, I guess one thing he would have
15             said was that he was just out here hiking and found the - - the - -
               the bundles and *they* were going to take it back to Tucson and
16             smoke it.
               Q. Did anyone else say though [sic] the exact same thing?
17             A. Yes.
               Q. Who said the exact same thing?
18             A. The person in Exhibit 3 [i.e., Defendant Ramirez].
               Q. So *these two individuals told you the exact same thing*?
19             A. That's correct.
               Q. Did they say it at the same time?
20             A. No.

21   (Narrance at pp, 117-118)(emphasis added). BPA Narrance recalls telling BPA Grayson

22   about the alleged incriminating statements. (*Id.* at pp. 118-119). Yet, BPA Grayson does not

23   remember which of the three Defendants denied smuggling marijuana; does not remember

24   which of the three Defendants said that they found the marijuana in the desert; he believes

25   it was Defendant Alvarez, but cannot say he is absolutely sure; *thinks all three said* they were

26   bringing marijuana to Tucson, but is not absolutely certain, but it might have been only

27   Defendants Rivera-Baltazar and Ramirez. (Grayson at pp. 54-55). Again, BPA Narrance

28   testified that Defendant Rivera-Baltazar did not make any statements. (Narrance at pp. 93-

96).

Defendants were not threatened, yelled at, or deprived of food or water while being questioned. (Grayson at pp. 23-24; Narrance at p. 96). Defendants did not appear scared or apprehensive. (Narrance at pp. 98-99).

Based upon presumably only Defendants Alvarez' and Ramirez' responses; Defendants' proximity to the bundled marijuana; the fact that Defendants ran upon seeing BPA Grayson; and BPA Edmison's conclusion that footprints found where Defendants were first observed sitting, matched footprints leading to the location where the bundles were found.[3] BPA Edmison did not ascribe specific footprints to specific Defendants. (Grayson at p. 82). Defendants were then advised that they were under arrest. (*Id.* at p.46). BPAs Grayson and Edmison went back to retrieve the bundles. (*Id.* at pp. 20-21, 46-47, 81).

### 3.    Statements At Border Patrol Station

After 10 minutes at the Border Patrol vehicles, Defendants were transported to the Border Patrol Station 1½ hours from the rifle range. (Grayson at p. 24; Narrance at p. 100). Defendants were not questioned nor did Defendants make statements en route to the Border Patrol Station. (Grayson at p.38). The confiscated marijuana was weighed and labeled. (*Id.* at p. 24). Narrance fingerprinted Defendants at the Border Patrol Station. (Narrance at pp, 99-100). Defendants Rivera-Baltazar and Alvarez did not make any statements. (*Id.*). Defendant Ramirez was not advised of his *Miranda* rights, reminded of his *Miranda* rights, or asked if he remembered his *Miranda* rights, because BPA Grayson did not feel that a significant amount of time had transpired from when Defendants were first advised at the rifle range to their later arrival at the Border Patrol Station. (Grayson at p. 79). *While* having his fingerprints taken, Defendant Ramirez was questioned by BPA Narrance, stating:

> "I will never do this again." I asked him what he meant by that. Mr. Ramirez then told me that he meant that he would never smuggle drugs again. He told me that he wanted to make some money and knew people in his neighborhood that could get him

---

[3]BPA Edmison did not take photos or videotape or memorialized the claimed footprints in the area of Defendants' arrest.

involved in drug smuggling. I asked him who his contact was, but Mr. Ramirez wouldn't tell me. He stated that *Julio Baltazar, Santos Alvarez, and himself* were taken by truck the night before and dropped off west of the SR-86 checkpoint. This would most likely be near the village of San Pedro. *They* were given instructions to walk north into the hills and a man would meet them. *They* did this and met *their* contact. The contact took the *three individuals* to the narcotics. That night and next day, the *four individuals* walked the narcotics north and then east to get the illegal substance around the SR-86 U.S. Border Patrol checkpoint. Mr. Ramirez described the fourth individual as a Mexican national. Ramirez claimed that he observed this fourth individual using heroin intravenously several times along the trip. He claims that *Mr. Alvarez, Mr. Baltazar, and himself* would be paid after the narcotics had been picked up by the next set of smugglers. When all four individuals observed Agent Grayson and Edmison, Mr. Ramirez stated that *Mr. Alvarez, Mr Baltazar, and himself* eventually quit running because *they* were exhausted from carrying the narcotics and that *they* didn't know where *they* were. He said that the fourth individual guided them on where to go.

(Defense Exhibit 14; Narrance at p. 101). BPA Narrance told BPA Grayson about these statements. (Narrance at pp. 118-119; Grayson at p. 60). The person responsible for filling out the I-214 waiver of *Miranda* rights form was either BPA Grayson or BPA Edmison. (Narrance at pp. 121-122). BPA Narrance recalls that Defendant Ramirez signed an I-214 waiver of *Miranda* rights form, but does recall if was signed *before or after* he was fingerprinted. (*Id.* at p. 122).

#### 4.     Rivera-Baltazar 404(b) Allegation

On June 29, 2010, fifty-seven days after being arrested and later indicted for conspiracy to possess with the intent to distribute 120 kilograms of marijuana and knowingly and intentionally possessing with the intent to distribute 120 kilograms of marijuana in the instant case, Defendant Rivera-Baltazar was arrested and later indicted for conspiracy to possess with the intent to distribute 46.17 kilograms of marijuana and knowingly and intentionally possessing with the intent to distribute 46.17 kilograms of marijuana in CR 10-01855-TUC-RCC)DTF. The Government alleges the events of June 29, 2010 as a *subsequent* prior bad act pursuant to Fed.R.Evid. 404(b) against Defendant Rivera-Baltazar. The Government also opposes severance of Defendants. (Doc. 28).

The specific facts alleged by the Government under Fed.R.Evid. 404(b) are that

- 9 -

Border Patrol agents assigned to man the Border Patrol checkpoint on State Highway 86 located west of Three Points, Arizona, in the evening of June 29, 2010 responded to suspicious activity regarding a vehicle parked behind a store that was closed for business. The Government alleges in its motion that "[t]he Agent had noticed that there were three people in the vehicle when he first observed it, but that there was only one person by the vehicle when it stopped in the parking lot of a business. Another Agent searched the surrounding area and saw [Defendant Rivera-Baltazar] hiding in the [sic] bush, about 100 yards from the business." (Doc. 65 at p. 2).  A review of the complaint in CR 10-01855-TUC-RCC(DTF) indicates that "a border patrol agent investigated suspicious activity when he saw Randolph ALVAREZ-BALTAZAR stop his vehicle behind a closed store and several people got out of the vehicle. Law enforcement conducted an investigation and located Julio [RIVERA-]BALTAZAR and Jose Aurelio FLORES-SALAS nearby with two bundles of marijuana." (Doc. 1). The Government alleges that "[t]he Agent gave commands to the [Defendant Rivera-Baltazar], but he started walking away. The Agent noticed a burlap backpack within arms length of [Defendant Rivera-Baltazar]. Eventually,  [Defendant Rivera-Baltazar] obeyed the commands of the Agent and was apprehended. The backpack was subsequently inspected and found to contain marijuana." (Doc. 65 at p. 2). The Government alleges the instant offense of May 3, 2010 and the subsequent "prior" bad act of June 29, 2010 "occurred within a 10 mile radius from one another, and [in] both instances, the defendant was found within feet of the marijuana, and he was determined to leave the location of the marijuana on foot." (*Id.* at p. 5). A review of the complaint in CR 10-01855-TUC-RCC(DTF) indicates that "FLORES-SALAS also explained that Julio [Rivera-Baltazar] was going to help guide them around the border patrol checkpoint to avoid detection. (Doc. 1). **II. ANALYSIS**

### A.    Joinder and Severance

Fed.R.Crim.P. 8(b) provides for joinder of multiple defendants in the same indictment whenever the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

> "[T]ransactions" has a flexible meaning and ... the existence of a "series" depends upon the degree to which the events are related. Mere factual similarity of events will not suffice. Rather, there must be some greater "logical relationship" between the occurrences. Such a logical relationship may be shown by the existence of a common plan scheme, or conspiracy.

*United States v. Sarkisian*, 197 F.3d 966, 976 (9th Cir. 1999)(*quoting United states v. Ford,* 632 F.2d 1354, 1371-72 (9th Cir. 1980)); *United States v. Golb*, 69 F.3d 1417, 1425-26 (9th Cir. 1995). The validity of joinder of defendants under Fed.R.Crim.P. 8(b) is determined solely by the allegations in the indictment. *United States v. Lane,* 474 U.S. 438, 447 (1986). Defendants herein were found together on the same day and time, in the same location, near bundles of marijuana, attempting to escape in concert and are charged in a conspiracy to possess with the intent to distribute the bundled marijuana. Joinder herein was proper under Fed.R.Crim.P. 8(b).

Severance, on the other hand, is controlled entirely by Fed.R.Crim.P. 14, which requires a showing of prejudice. *Schaffer v. United States*, 362 U.S. 511, 515-516 (1960):

> If the joinder of offenses or defendants in an indictment, an information or a consolidation for trial appears to prejudice a defendant ... , the court may ... sever the defendant's trials ....

Fed.R.Crim.P. 14(a). Severance is to be granted "only if there is a serious risk that a joint trial would compromise s specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007).

Prejudice may result from a co-defendant's antagonistic or mutually exclusive defenses, for it could force a jury to opt between competing defenses necessarily acquitting one while convicting the other. However, mutually antagonistic defenses are not prejudicial *per se. Zafiro*, 506 U.S. at 538; *United States v. Johnson*, 297 F.3d 845, 859 (9th Cir. 2002).

Prejudice can also occur by the introduction of a co-defendants's extrajudicial confession that incriminates the defendant. *Bruton v. United States*, 391 U.S. 123, 137 (1968). There is no *Bruton* violation necessitating severance if the co-defendant's out-of-court statement does not implicate the defendant. *Mason v. Yarborough*, 447 F.3d 693, 696

- 11 -

(9th Cir. 2006)(no *Bruton* violation because co-defendant's out-of-court statement was only incriminating when linked with other evidence and statement was not introduced but merely referred to by government witness); *United Sates v. Mayfield*, 189 F.3d 895, 902 (9th Cir. 1999)(*Bruton* violation when co-defendant's redacted out-of-court statement still implicated defendant and defendant could not compel co-defendant to take the stand).

To preserve for appeal a claim of failure to sever under Fed.R.Crim.P. 14(b), a defendant must make a timely motion prior to trial. *United States v. Smith*, 795 F.2d 841, 850 (9th Cir. 1986). A motion to sever must also be renewed at the end of trial. *United States v. Sullivan*, 522 F.3d 967, 981-82 (9th Cir. 2008). The trial court has broad discretion to grant or deny severance of defendants. *Zafiro*, 506 U.S. at 541; *United States v. Jawara*, 474 F.3d 565, 572 (9th Cir. 2007). The trial court must balance the interest  in  judicial economy against the risk of prejudice to the defendant or the government. *United States v. Pitner*, 307 F.3d 1178, 1181-82 (9th Cir. 2002).

Other than severance, a remedy available to a trial court is redaction. To avoid a *Bruton* violation, a redacted statement cannot be incriminating on its face. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). The redacted statement must remove any references of the defendant's existence. *Id.* References that a jury can use to identify the defendant must be removed. *United States v. Gillam*, 167 F.3d 1273, 1277 (9th Cir. 1999.

## 1.    Statements En Route to BPA Vehicles

BPA Grayson's memorialization of Defendants' responses are characterized in broadly inclusive pronouns, as though each in unison, or not, said the same thing. BPA Grayson's *Terry* inquiry of Defendants regarding their citizenship to do not implicate Defendants. BPA Grayson's inability to attribute specifically to either Defendant Alvarez or to Defendant Ramirez the response of "*we* were scared", and the responses by Defendants that "*they* 'didn't want to get in trouble'" suggest inculpation. They are not capable of redaction for it is unknown if each Defendant said the same thing. Replacing "we" and "they" with "deletion" or "deleted", "other individuals", or a blank space makes the naming of Defendants obvious to the jury and would render *Bruton*'s protective rule a nullity. *See*

1    *Gray v. Maryland*, 523 U.S. 185. 192 (1998).

2           The District Court has discretion to sever Defendants' trial, or for judicial economy,

3    preclude the introduction of the aforesaid declarations.

4                         **2.      Statements At BPA Vehicles**

5           Defendant Rivera-Baltazar did not make any statements to Border Patrol officers

6    while at the BPA vehicles. Ascribing to all Defendants responses in the collective pronouns

7    such as "the three individuals", "all individuals", "they", "they were all three", "all three",

8    and "themselves" as well as BPA Grayson acknowledgment that he cannot ascribe to a

9    particular Defendant specific statements, makes it possible no one particular statement was

10   made by any one particular Defendant, further complicating the District Court's ability to

11   properly redact statements allegedly made by Defendants. (*See* Grayson at pp. 45-46,54-55).

12   Again, replacing the aforesaid collective  references with "deletion", "deleted", "other

13   individuals", or a blank space, would make the naming of Defendant's obvious to the jury

14   and would render *Bruton*'s protective rule a nullity.  Using "I" in place of collective

15   references and ascribing the same words to each Defendant, would have the effect of

16   strengthening the Government's case of an implicit conspiracy, by each Defendant then

17   pointing an accusatory finger at himself.   Minimizing the out-of-court confession's

18   inculpatory effect sought to be avoided under *Bruton* would not be achieved.  Redaction in

19   any form, in this Court's opinion, is prejudicial.     The District Court has discretion to sever

20   Defendants' trial,  or preclude for judicial economy, the introduction of the aforesaid

21   declarations.

22                         **3.      Statements At Border Patrol Station**

23          Statements by Defendant Ramirez at the Border Patrol Station while being

24   fingerprinted, fall well within the protective rule of *Bruton*. Defendant Ramirez directly

25   implicates Defendants Alvarez and Rivera-Baltazar in the drug-smuggling of May 3, 2010

26   and the manner it was to be carried out. Again, replacing collective references with

27   "deletion", "deleted", "other individuals", or a blank space would make the naming of

28   Defendants obvious to the jury. Ascribing to Defendant Ramirez only, by use of "I" wherever

1   Defendants Rivera-Baltazar and Alvarez are referred to directly or indirectly, still has the
2   deleterious effect of further implicating Defendants Rivera-Baltazar and Alvarez, given that
3   they were found together. Redaction in any form, in this Court's opinion, would be
4   prejudicial.

5          The District Court has discretion to sever Defendant's trial, or preclude for judicial,
6   the introduction of the aforesaid declarations.

### 4.     Rivera-Baltazar 404(b) Allegation

8          The Government is correct that Defendant Rivera-Baltazar's arrest on June 29, 2010
9   is a properly admissible *subsequent* prior bad act against him. However, the very same
10  striking similarities of June 29, 2010 invoked by the Government (i.e., the nature of the
11  offense, conspiracy to commit the offense, the type of drug, the location of the drug,
12  Defendant's proximity to the drug, and determination to abscond from the drug's location
13  when confronted by law enforcement) to the instant offense prejudices Defendants Alvarez
14  and Ramirez. The parallels, despite a limiting instruction to the jury that the subsequent
15  "prior" bad act is to be considered only as to Defendant Rivera-Baltazar, would nonetheless
16  postulate in the juror's minds that: (1) Defendant Rivera-Baltazar's propensity to conspire
17  to  commit the offense of  May 3, 2010 is akin to the conspiracy on June 29, 2010 with
18  Defendants Alvarez and Ramirez; (2) Defendant Rivera-Baltazar's conspiracy to possess
19  marijuana on May 3, 2010 is akin to the conspiracy to possess marijuana on June 29, 2010
20  with Defendants Alvarez and Ramirez; (3) The location of Defendant Rivera-Baltazar's
21  conspiracy on May 3, 2010 is akin to the location of the conspiracy on June 29, 2010 with
22  Defendants Alvarez and Ramirez. Transference of guilt from Defendant Rivera-Baltazar to
23  Defendants Alvarez and Ramirez is inevitable. *See Kotteakos v. United States*, 328 U.S. 750,
24  774 (1946)("The dangers for transference of guilt from one to another across the line
25  separating conspiracies, subconsciously or otherwise, are so great that no one can really say
26  prejudice to [a] substantial right has not taken place.").

27         The District Court has discretion to sever Defendant Rivera-Baltazar's trial from the
28  joint trial of Defendants Alvarez and Ramirez, or for judicial economy, preclude introduction

of 404(b) evidence against Defendant Rivera-Baltazar in a joint trial.

**5.    Antagonistic Defenses**

Defendant Alvarez posits a defense theory that he arrived independently at the location of arrest, and thus, it is inconsistent with statements ascribed to Defendants that all Defendants arrived together on the eve of May 3, 2010. A review of exhibits and testimony given, does not at this time indicate Defendant Alvarez' maintained or suggested such a defense. Consequently, it is but a theory. Given that all Defendants are arrested together, only Defendant, or one or both Co-Defendants can  corroborate Defendant Alvarez' theory. Should Defendant Alvarez testify, he could be impeached by statements ascribed to him by Border Patrol.

If Defendant Alvarez  seeks one or both Co-Defendants to testify, he has not proffered: (1) his good faith intent to have a Co-Defendant testify; (2) the possible weight and credibility of the predicted testimony; (3) the probability that such testimony will materialize;(4) the economy of a joint trial; and (5) the exculpatory nature and effect of the desired testimony. *See United States v. Mariscal*, 939 F.2d 884, 886 (9th Cir. 1991). A factor to be considered by the trial court in severing defendants from a joint trial is whether it is likely that the offered testimony offered by a co-defendant  will be subject to effective impeachment. *United States v. Hoelker*, 765 F.2d 1422, 1425 (9th Cir. 1985)(denial of severance upheld in part because proffered testimony had been rejected by earlier jury and was subject to damaging impeachment). Either Co-Defendant could testify on behalf of Defendant Alvarez. They would be subject to effective impeachment by the Government. The impeaching statements would be that Defendant Alvarez conspired to and did possess 120 kilograms of marijuana.

**III. RECOMMENDATION**

Statements ascribed as having been made by each Defendant during the *Terry* stop and post-*Miranda*, whether at  the Border Patrol vehicles or at the Border Patrol Station, inculpate one another. Redaction of statements ascribed to each Defendant is not possible in any form. After review of the record in this matter, the Magistrate Judge recommends that

the District Court:

      1. Sever Defendants from a joint trial, or alternatively for judical economy, preclude use of their statements at a joint trial in the Government's case-in-chief; or

      2. Sever Defendant Rivera-Baltazar from Defendants Alvarez' and Ramirez' joint trial and preclude for judicial economy, the use of their statements at their joint trial in the Government's case-in-chief.

      Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. If objections are filed, parties should use the following case number: **CR 10-01245-TUC-JMR.**

      Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

      DATED this 8th day of October, 2010.

_____
Héctor C. Estrada
United States Magistrate Judge

- 16 -